UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:

Robert Diamond
aka Rob Diamond,                                         Case No. 20-71878-reg
                                                                                   Chapter 7
                             Debtor.
------------------------------------------------------------------x
Marc A. Pergament, Chapter 7 Trustee of
the Estate of Diamond Finance Co., Inc.,

                                                             Plaintiff,           Adv. Pro. No. 20-8175-reg
                 - against -

Rob Diamond aka Robert Diamond,

                                                            Defendant.
------------------------------------------------------------------x

## **DECISION AFTER TRIAL**

        This matter is before the Court pursuant to an adversary proceeding commenced by the chapter 7 trustee ("Plaintiff") for the bankruptcy case of Diamond Finance Co., Inc. ("DFC") seeking to have certain debts owed by Rob Diamond aka Robert Diamond ("Debtor" or "Defendant"), the sole shareholder of DFC, deemed non-dischargeable in his own bankruptcy case. The Debtor, who has been criminally indicted for conduct related to this adversary proceeding, managed to obtain a discharge in his bankruptcy case despite oversight by the Plaintiff, the Chapter 7 trustee in the Debtor's case and the Office of the United States Trustee. While this non-dischargeability proceeding is the sole vehicle of recourse against the Debtor and is limited to examining certain specific debts, it forces the Court to examine a more global question. The bankruptcy system for Chapter 7 cases is heavily reliant on the expertise of the United States Trustee office and the appointed panel trustees. The vast majority of these cases

1

progress through this system seamlessly. Unfortunately, no system is perfect and where issues are uncovered, they should be addressed. In this case the record reflects a debtor who conducted business in a manner that violated the law. The fact that a grand jury subsequently indicted the Debtor for the very acts highlighted herein should raise red flags as to why the Debtor received a discharge. While an investigation of the facts may show that their actions were appropriate the Court believes the very integrity of the system requires a full and careful analysis.

There are two distinct debts at issue. One is derived from losses incurred by creditors/investors in a Ponzi scheme perpetrated by DFC, and the second relates to money the Debtor diverted from DFC to another entity owned and controlled by the Debtor. The Plaintiff seeks to have both debts deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).

Because the losses suffered by the investors of DFC are deemed personal to each investor, the Plaintiff lacks standing to seek a non-dischargeability finding as to those debts. However, claims arising from the Debtor's conduct that injured DFC, which include the Debtor's diversion of funds from DFC to another entity, belong to the Plaintiff as the trustee of DFC. Therefore, the Plaintiff has standing to seek a finding that these claims are non-dischargeable.

The Debtor participated in person at trial where he asserted, as is his right, his Fifth Amendment privilege and additionally placed no exhibits into evidence. Based on the record and as supported by evidence introduced by the Plaintiff, the Court finds that the Plaintiff has failed to establish a *prima facie* claim with respect to the cause of action under § 523(a)(2). The Plaintiff failed to show that the fraudulent conveyance claim fits within this section of the Code. The fraudulent conveyance claim is not a debt for money obtained by false representations or false pretenses. As for actual fraud, the only possible avenue for non-dischargeability is under

*Husky Intern. Elecs., Inc. v. Ritz*, 578 U.S. 355 (2016), which clarifies that fraudulent conveyance schemes may fit within the definition of "fraud" under this subsection. In *Husky*, the Supreme Court recognized that a transfer scheme employed by a debtor to hinder a creditor's ability to collect a debt amounts to "fraud" as set forth in § 523(a)(2) even though no false representations were made by the debtor to a creditor. While the Debtor did orchestrate a Ponzi scheme, which by necessity involves fraud, the investors were the ones who were hindered from collecting their debts. Such claims would belong to the investors in their individual capacities, not the Plaintiff on behalf of DFC. To the extent that the *Husky* decision applies to recipients of fraudulent conveyances who file for bankruptcy relief as debts "obtained by" fraud, the recipient of the conveyances is not the Debtor but an entity controlled by the Debtor. The Plaintiff failed to make a sufficient showing that the transfers to the third party were for the direct benefit of the Debtor. Without evidence substantiating that the Debtor directly benefited from the funds transferred from DFC to the third party entity, there is no basis for the Court to find that this debt is non-dischargeable under *Husky*.

With respect to the remaining two causes of action, the Plaintiff has established by a preponderance of the evidence that the Defendant breached his fiduciary duty and acted willfully and maliciously when he transferred funds from DFC to another entity in furtherance of the Ponzi scheme. As an officer and sole owner of DFC, he owed a fiduciary duty to DFC not to waste assets or take actions which harmed DFC. He breached this duty when he made the transfers in connection with the Ponzi scheme. His willful and malicious intent is established by the evidence presented by the Plaintiff which is buttressed by the Debtor's blanket assertion of his Fifth Amendment privilege. This, along with the Ponzi finding, permits the Court to infer his

intent. For these reasons as more fully set forth below, the debt in the amount of $3,203,542 is found to be nondischargeable under § 523 (a)(4) and (a)(6) of the Bankruptcy Code.

## **PROCEDURAL HISTORY**

On April 14, 2020 ("Petition Date"), two separate involuntary petitions under Chapter 7 of the Bankruptcy Code were filed against DFC and the Defendant. On May 20, 2020, the Plaintiff was appointed as the Chapter 7 trustee for DFC. Allan B. Mendelsohn ("Diamond Trustee") was appointed as the Chapter 7 trustee in the Debtor's case. On June 16, 2020, the Plaintiff, in his capacity as the duly appointed Chapter 7 Trustee of the Estate of DFC, filed a proof of claim in the Debtor's case in an unfixed amount. The claims are described as "[p]otential fraudulent conveyances, breach of fiduciary duty claims and preferential transfers." For whatever reason, the Plaintiff failed to commence a fraudulent conveyance action or any other action with respect to the claims listed in the proof of claim. The investors of DFC filed their own proofs of claim in the Debtor's case, seeking to recover the amounts they lost in connection with the Ponzi scheme which was run through DFC. None of the investors individually commenced any proceeding objecting to the dischargeability of their claims or the discharge of the Debtor. The Diamond Trustee obtained several extensions of time to file a complaint objecting to the Debtor's discharge but never filed a complaint against the Debtor. On February 15, 2022, the Debtor received his discharge. The Court would be remiss if it failed to note that this Debtor was subsequently indicted in Nassau County for many of the actions described herein. It concerns the Court that despite a clear record of abuse, the Debtor received a discharge in his case.

On November 13, 2020, the Trustee commenced this adversary proceeding against the Defendant asserting that certain debts owed by the Defendant are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). On May 20, 2020, the Plaintiff filed an amended complaint asserting identical claims pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). The Defendant filed an answer to which he asserted his privileges under the Fifth Amendment of the United States Constitution, Art. 1 § 6 of the New York State Constitution, and N.Y.C.P.L.R. 4501 (collectively, the "Fifth Amendment Privilege"). On March 6, 2022, the Defendant responded to the Plaintiff's Notice to Admit by asserting his Fifth Amendment Privilege. Similarly, at his deposition on July 1, 2022, the Defendant asserted his Fifth Amendment Privilege. Thereafter, the Plaintiff moved for summary judgment ("MSJ") on February 3, 2023 along with a Statement Pursuant to Rule 7056-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of New York containing 159 statements of undisputed material fact supported by citations to admissible evidence ("Rule 56 Statement"). The Defendant did not file any opposition in response to the MSJ by the deadline. After the Defendant's failure to appear at the hearing on the MSJ, this Court scheduled a trial to commence on April 18, 2023. At trial, the Defendant was called as a witness, to which he asserted his Fifth Amendment Privilege to essentially every question asked regarding his operation of DFC and the transfers made by DFC to Auto City International, Inc. ("Auto City"). The Defendant did not object to the admission of Plaintiff's thirty-two trial exhibits into evidence. The Defendant declined to cross-examine himself, present any witnesses, or offer any evidence to refute the Plaintiff's case. Upon conclusion of the trial, the adversary proceeding was marked submitted.

## FACTS

The Defendant's control and management of DFC and its related entities has been set out in detail in the Court's decision in *In re Diamond Fin. Co., Inc.,* 658 B.R. 754 (Bankr. E.D.N.Y. 2024) ("DFC Decision"). In the DFC Decision, this Court found that DFC operated as a Ponzi scheme from April 2020 through the Petition Date (the "Ponzi Period"). As a result, the "Ponzi scheme presumption" applied to establish the presumption of actual intent to defraud the investors in DFC under 11 U.S.C. § 548(a)(1)(A) and NY DCL § 276. The finding of a Ponzi scheme also established DFC's insolvency as a matter of law.

To analyze the claims in this complaint, the following findings contained in the DFC Decision, along with the exhibits in this adversary proceeding, are relevant. The Defendant was the sole shareholder and person in control of DFC. DFC's purported business model was providing automobile financing to consumers who were generally unable to secure market-rate financing. DFC would purchase the installment sale contracts from dealers in these transactions. The automobile purchaser would then make the required payments directly to DFC. DFC secured funding from private investors via loans evidenced by promissory notes.

Auto City was a used car dealership solely owned and controlled by the Defendant. Under the claimed business model, DFC would make advances to Auto City which were to be used to pay off the floor plan advances Auto City received to purchase its cars for sale. When customers obtained loans to finance their auto purchases, Auto City would assign the loan documents to DFC for DFC to collect payment directly from the customers. The dollars DFC advanced to Auto City should have corresponded to the value of the notes assigned to DFC. However, this was not the case.

Francine Haviken, the bookkeeper for DFC during the Ponzi Period, testified that DFC would make advances to Auto City and in return, DFC was to receive notes from car purchasers which would generate cash flow to DFC. Ex. 4 to MSJ at p. 70. Over the years, the value of the notes DFC received fell short of the dollars DFC transferred to Auto City, and the amount owed by Auto City to DFC increased over time. Ex. 4 to MSJ at p. 71-73. The Expert Report prepared for the Plaintiff reflected that advances to dealers increased each year except for 2015. The advances to dealers were to be used by Auto City as prepayment for the sales of autos and were to be repaid from future Auto City sales. However, the balance in this account increased from $1,229,150 due to DFC as of December 31, 2012, to $3,003,990 due to DFC as of December 31, 2019. Pl. Ex. 5, p. 9. As a result, DFC received little to no benefit from the transfers to Auto City.

The Defendant was the sole shareholder of DFC. While operating DFC as a Ponzi scheme, the Defendant made material misrepresentations to investors regarding the financial condition of DFC for the purpose of inducing further investment. Based on the proofs of claim filed in the DFC case, investors were injured in the amount of $7,130,000. This number is comprised of the total amounts invested with DFC. The portion sought to be non-dischargeable in this case is $3,929,359.00.[1] During the Ponzi Period, the Defendant caused DFC to make a series of transfers to Auto City in the amount of $3,431,924 while DFC only received back the sum of $228,382. These transfers did not benefit DFC and did not serve any legitimate business purpose. As a result, DFC suffered losses in the amount of $3,203,542.

---

[1] This amount is the difference between the proofs of claim filed by the private investors in the amount of $7,130,000 and the interest paid to those investors in the amount of $3,200,641 during the Ponzi Period.

## ANALYSIS

There are two distinct debts for which the Trustee seeks a finding of non-dischargeability: the aggregate losses suffered by the investors in DFC and the aggregate net total of funds transferred from DFC to Auto City for which DFC received no benefit. In both instances the Defendant was the primary actor in soliciting the investors' investments in DFC utilizing false representations and then diverting those funds from DFC to Auto City. Although the Defendant did not provide testimony other than to assert his Fifth Amendment privilege against self-incriminations, the burden remains on the Plaintiff to establish a *prima facie* case for each cause of action stated in the complaint.

While not raised by the Defendant, the Plaintiff's standing to pursue this action against the Defendant must be addressed at the outset. Along with the requirement of a case or controversy to satisfy Article III of the Constitution, the party seeking redress must be asserting their own legal rights. *Warth v. Seldin,* 422 U.S. 490, 499 (1975); *Breeden v. Kirkpatrick & Lockhart, LLP,* 268 B.R. 704, 708-09 (S.D.N.Y.2001), *aff'd,* 336 F.3d 94 (2d Cir. 2003); *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir. 2000); *see also Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 428 (1972). "To have standing, '[a] plaintiff must [1] allege personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief.'" *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1091 (2d Cir. 1995) (other citations omitted). A trustee in bankruptcy "stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991). "In addition, the plaintiff must comply with 'prudential limitations on standing, of which the salient one . . . is that a party must 'assert his own legal rights and interest

8

and cannot rest his claim to relief on the legal rights or interests of third parties.'" *In re Barnard L. Madoff Inv. Securities LLC*, 721 F.3d 54, 66 (2d Cir. 2013) (citing *Warth*, 422 U.S. at 499).

The Second Circuit relied on Supreme Court precedent for these prudential limits:

> In *Caplin* …, the Supreme Court ruled that federal bankruptcy law does not empower a trustee to collect money owed to creditors. That is because a bankruptcy trustee is not empowered 'to collect money not owed to the estate'; the trustee's proper task 'is simply to collect and reduce to money the property of the estates for which (he is trustee)' *Id*. at 428-29.

*In re Barnard L. Madoff Inv. Securities LLC*, 721 F.3d at 67.

As a result, the Plaintiff only has standing to bring claims that DFC could bring against the Defendant. Applicable state law determines whether the claim belongs to the debtor or the individual creditors of the debtor. *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc*., 884 F.2d 688, 700 (2d Cir. 1989). In this case, the Trustee seeks to have certain debts deemed non-dischargeable under 11 U.S.C. §523(a)(2), (4) and/or (6). Clearly, the Trustee has standing on behalf of the estate of DFC to commence a section 523 action against the Defendant. What must be resolved is whether the types of debt at issue are ones for which the Trustee has standing to pursue.

Taking the losses suffered by investors of DFC first, these are debts owed to creditors of DFC in varying amounts, and do not reflect harm suffered by DFC in general. While the creditors suffered losses from the Ponzi scheme and the Debtor's fraudulent conduct, each creditor has its own particularized set of injuries which are direct and personal. Because the losses are not general injuries suffered by DFC, any claims arising from such injuries belong to the creditors of DCF who invested based on false representations made by the Debtor. See *Hirsch v. Arthur Andersen & Co*., 72 F.3d at 1093 (Claims of investors in a debtor's Ponzi scheme based on fraudulent misconduct by the debtor's principal belong to the individual

9

investors, not the bankruptcy trustee). The Court is aware the Debtor has been received a discharge in his individual bankruptcy. No complaint objecting to the Debtor's discharge was filed by the Debtor's Trustee or any investor in the Ponzi scheme. The Plaintiff did not file a complaint objecting to the Debtor's discharge either. That an individual debtor who has been found to have orchestrated a Ponzi scheme and has subsequently been indicted by a Grand Jury in Nassau County was granted a discharge causes great concern to this Court. The Court believes the Office of the United States Trustee should be equally concerned. The result is that the individual victims of the Ponzi scheme may have no recourse against the Debtor other than as recipients of distributions in the instant case and in the DFC case.

The second debt is based on the transfers from the Debtor to Auto City for which the Debtor received no value. Because this debt is based on an injury to DFC and not to any individual creditor of DFC, the Trustee has standing to seek a finding of non-dischargeability as to this debt. As the Court of Appeals for the Second Circuit has held, a bankruptcy trustee, suing on behalf of the debtor under New York law, has standing to bring an action for breach of fiduciary duty against a fiduciary of the debtor. *In re Mediators, Inc*., 105 F.3d 822, 827 (2d Cir. 1997) (citing *In re Keene Corporation*, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994)). Therefore, the amount of debt which may be non-dischargeable is limited to $3,203,542 ("Auto City Transfers").

### 11 USC § 523(a)(2)(A)

Section 523(a)(2)(A) of the Code excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...." 11 U.S.C. § 523(a)(2)(A). "The plaintiff can satisfy a claim

under § 523(a)(2)(A) by establishing one of the three types of fraud." *Indo-Med Commodities, Inc. v. Wisell (In re Wisell)*, 494 B.R. 23, 35 (Bankr. E.D.N.Y. 2011).

To show that a debt was obtained by false pretenses requires the movant to establish: (1) an implied misrepresentation or conduct by the defendant; (2) which was promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property or credit to the defendant. *In re Mines*, 630 B.R. 107, 116 (Bankr. E.D.N.Y. 2021) (citing *Voyatzoglou et al. v. Hambley (In re Hambley)*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005)). A false pretense occurs when there is "conscious deceptive or misleading conduct calculated to obtain or deprive another of property." *Id. (citing Gentry et al. v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000)).

For a debt to be obtained by false representation, one must show that: (1) the defendant made a false or misleading statement; (2) with intent to deceive; (3) to induce the plaintiff to turn over money or property to the defendant. *Id.* A debt obtained by a false representation involves a "definable statement by the debtor that results in a misrepresentation," while a false pretense requires conduct by the debtor that "implies or promotes a scheme that is misleading." *Id. (quoting Argento v. Cahill (In re Cahill)*, Case No. 15–72418, Adv. Pro. No. 15-08298, 2017 WL 713565, at *6-7 (Bankr. E.D.N.Y. Feb. 27, 2017)).

Finally, to establish actual fraud under section 523(a)(2)(A), the movant must prove that: (1) the debtor made a false representation; (2) the debtor knew the statement was false at the time it was made; (3) the misrepresentation was made with an intent to deceive; (4) the creditor reasonably relied on that misrepresentation; and (5) the creditor was damaged as a result of the misrepresentation. *Id.* at 116-17. The Supreme Court has broadened the term "actual fraud" to

11

also encompass fraud that does not include false representations. *See Husky,* 578 U.S. at 359 ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation"). !!

The *Husky* Court stated that under common law, a fraudulent conveyance is deemed a "fraud," but it is not one that requires a misrepresentation from a debtor to a creditor. *Id.* at 361. In fraudulent conveyance cases, "the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt. It is in the acts of concealment and hindrance." *Id.* at 362. The Supreme Court postulated that if a debtor obtained assets by participating in a fraudulent conveyance and the debt could be traced to the fraudulent conveyance, it would be nondischargeable under §523(a)(2). *Id*. at 364-65. *See also In re Kedia*, 607 B.R. 101, 109 (Bankr. E.D.N.Y. 2019) ("The Court is convinced that the Debtor engaged in a fraudulent transfer scheme, which is sufficient to except the debt owed [the creditor] from the Debtor's discharge as 'actual fraud' pursuant to §523(a)(2)(A)").

The debt at issue is the Auto City Transfers. This debt was not incurred by false or misleading statements from the Debtor to induce a creditor to make transfers, and therefore the only potential avenue left is under the *Husky* analysis. However, even a broad reading of fraud as set forth in the *Husky* does not apply to the Auto City Transfers. In *Husky*, the Supreme Court held that a debtor's fraudulent act of transferring or concealing assets to preclude a creditor from collecting their debt from the debtor could render the underlying debt non-dischargeable. The "actual fraud" referred to in section 523(a)(2) could also refer to fraudulent conveyance schemes where a debtor is the recipient of a fraudulent conveyance and acted with the requisite fraudulent intent. *Id*. at 365. In *Husky*, the underlying debt owed to the creditor was the product of fraud itself, as the debt arose pursuant to a Texas law that allowed creditors to hold shareholders

12

responsible for corporate debt where the shareholder or beneficial owner used the corporation to perpetrate a fraud for the personal benefit of the shareholder. *Id*.

What the instant case lacks is a record from which the Court can find as a matter of law that the Auto City Transfers benefited the Debtor personally. The Plaintiff's Expert Report reflects that $2,280,627.17 was transferred out of Auto City to "Diamond Florr Pl" but there is nothing in the record to tie these transfers back to the Debtor. Pl. Ex. 5. The Plaintiff could have commenced a fraudulent conveyance action against the Debtor to establish the Debtor's liability as a recipient of fraudulent transfers but did not do so. Without a finding of such liability, the only avenue available to the Plaintiff was a finding that the Debtor was the recipient of the Auto City Transfers. The exhibits introduced at trial showed that significant funds were transferred by DFC to Auto City, and that Auto City transferred significant funds to Diamond Florr Pl but there is nothing in the record connecting the Debtor to an entity named Diamond Florr Pl. While the Court can easily conjure up a scenario as to how the Debtor is connected to the transaction it is the responsibility of the Plaintiff to provide the Court with a record that is sufficient to allow it to reach a legal conclusion. The law places the burden on the Plaintiff to meet a legal standard. When the Plaintiff fails to meet that standard, the Court must acknowledge that and recognize the consequences.

For these reasons, the Plaintiff failed to establish a *prima facie* case under section 523(a)(2) and the first cause of action is dismissed.

**11 USC § 523(a)(4)**

Section 523(a)(4) provides that a discharge does not discharge an individual debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The elements required to establish liability for fraud or

defalcation under § 523(a)(4) are "(1) the existence of a fiduciary relationship between the debtor and the plaintiff; (2) fraud or defalcation by the debtor while acting in that fiduciary capacity; which (3) gave rise to the debt which is claimed to be non-dischargeable." *In re Gucciardo*, 577 B.R. 23, 32 (Bankr. E.D.N.Y. 2017). "Defalcation" under 523(a)(4) requires a showing that the fiduciary committed an "'intentional wrong,' which incorporates a standard of conscious misbehavior or extreme recklessness." *Shao Ke v. Jianrong Wang*, 628 F. App'x. 10, 12 (2d Cir. 2015) (*quoting Bullock v. BankChampaign N.A.,* 569 U.S. 267, 273-74 (2013)). The elements of a fraud claim under section 523(a)(4) are the same as those under section 523(a)(2)(A). *In re Drummon*, No. 19-10670 (JLG), 2023 WL 8291564, at *21 (Bankr. S.D.N.Y. Nov. 30, 2023) *(citing Sharmat v. Gallen (In re Gallen)*, 559 B.R. 349, 357 (Bankr. S.D.N.Y. 2016)).

To sustain a claim for fraud or defalcation, "a plaintiff must first show that the defendant was acting in a fiduciary capacity 'with respect to the particular conduct giving rise to the liability which is claimed to be non-dischargeable.'" *In re Drummon*, 2023 WL 8291564, at *21 (*quoting Schlosser v. Heinemann (In re Heinemann)*, No. 19-9028, 2022 WL 17408094, at *2 (Bankr. S.D.N.Y. Dec. 2, 2022)).

The definition of "fiduciary capacity" is more restricted as a matter of federal law than it is under the more general common law or state law definition. *Id.* While a "'fiduciary relationship'" under § 523(a)(4) generally involves an express trust or technical trust, the Second Circuit has established that even in the absence of an actual trust, a fiduciary relationship for purposes of § 523(a)(4) may exist where there is a special trust or confidence between the parties. *In re Waldron*, No. 13-12190, 2015 WL 6734481, at *4 (Bankr. N.D.N.Y. Nov. 3, 2015) (citing A*ndy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes),* 183 F.3d 162, 166 (2d Cir.1999)). As the Court of Appeals for the Second Circuit has held, "federal law sets the outer

boundaries of the defalcation exception, while state law may, through lesser or greater regulation of fiduciary obligations, affect the application of the provision." *In re Hayes*, 183 F.3d at 167.

While there was no express or technical trust between the Debtor and DFC, the Court may look to state law to determine whether a trust relationship existed nonetheless. *In re Watterson*, 524 B.R. 445, 451 (Bankr. E.D.N.Y. 2015). In looking to New York law, the Court in *Gucciardo* stated:

> 'Under New York Law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of the creditors.' *Econ. Dev. Growth Enters. Corp. v. McDermott*, 478 B.R. 123, 128 (Bankr. N.D.N.Y. 2012) (quoting *Hughes v. BCI Int'l Holdings*, 452 F.Supp.2d 290, 308 (S.D.N.Y. 2006)). The fiduciary duty 'exists only to ensure that the directors do not funnel the assets of the corporation to themselves or to other shareholders, subverting the creditor's rights in bankruptcy.' *Econ. Dev. Growth*, 478 B.R. at 128 (quoting *Geren v. Quantum Chem. Corp.,* 99 F.3d 401 (2d Cir. 1995). This theory of fiduciary duty, called the 'trust fund doctrine', imposes trust obligations on the officers and directors and provides a basis for imposing liability to creditors "for wrongful dissipation of assets of an insolvent corporation". *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 550, 708 N.Y.S.2d 26, 729 N.E.2d 683 (2000). Because this duty arises at the time of insolvency and prior to wrongdoing, it meets the requirements of fiduciary capacity under § 523(a)(4). *Master–Halco, Inc. v. Picard (In re Picard*), 339 B.R. 542, 554 (Bankr. D. Conn. 2006) (holding that the fiduciary duty under trust fund doctrine arises when the corporation enters insolvency, not when the officer performs the wrongful act).

*In re Gucciardo,* 577 B.R. at 34.

Under New York law, when a corporation is insolvent, the "trust fund doctrine" creates a "trust" for purposes of section 523(a)(4), where the directors of the corporation have a fiduciary responsibility to maintain the corporation's assets. *See Itria Ventures, LLC v. O'Keefe*, 635 B.R. 15, 21 (N.D.N.Y. 2021) ("Under the trust fund doctrine, directors of an insolvent corporation hold the remaining corporate assets 'in trust' for the benefit of creditors").

DFC was an undercapitalized company controlled exclusively by the Defendant. The Defendant ran a Ponzi scheme through DFC and transferred DFC's funds to Auto City, to the detriment of DFC and its investors. The Defendant, as DFC's sole director and shareholder, was responsible for ensuring that assets of DFC were not diverted to third parties without proper compensation. As the Court previously held, DFC made specific "advances" or "loans" to Auto City in the sum of over $3 million, which were never repaid and for which DFC only received approximately $200,000 in return. DFC was technically insolvent during the Ponzi Period, but DFC's insolvency can also be established as a matter of law via the determination that it operated as a Ponzi scheme. *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 104, 110 n. 15 (Bankr. S.D.N.Y. 2011).

Having established a fiduciary relationship, the Court will determine whether defalcation took place. "Defalcation, which is a misappropriation or failure to account by a fiduciary, requires a showing of 'conscious misbehavior or extreme recklessness.'" *In re Seung Min Park*, No. 09-78622-DTE, 2011 WL 1344495, at *5 (Bankr. E.D.N.Y. Apr. 8, 2011) (quoting *In re Hyman*, 502 F.3d 61, 68 (2d Cir. 2007)). The Debtor committed "defalcation" under §523(a)(4) by transferring funds belonging to DFC to Auto City without compensation, which injured DFC.

Since DFC was technically insolvent and insolvent as a matter of law, the diversion of DFC assets directly harmed DFC as a corporate entity. Therefore, the Plaintiff has established that the debt arising from the All City Transfers is non-dischargeable under §523(a)(4).

**11 USC § 523(a)(6)**

To establish non-dischargeability of a debt under § 523(a)(6), the creditor must show that the debt at issue resulted from a "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "Willful" and "malicious" are separate

16

elements which must be established by a preponderance of the evidence. *In re Khafaga*, 419 B.R. 539, 548 (Bankr. E.D.N.Y. 2009).

"Willful" injury means a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). Willfulness is found where the debtor "knows that the consequences are certain, or substantially certain, to result from his act." *Myer's Lawn Care Servs., Inc. v. Fragala (In re Fragala)*, 645 B.R. 488, 499 (Bankr. E.D.N.Y. 2022), *appeal dismissed*, 2024 WL 3718666 (Aug. 6, 2024).

"Malicious" has been defined to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir.1996). There are three types of malice: (1) actual malice, (2) "implied malice," where the actionable conduct has no potential for economic gain or other benefit to the debtor, pointing to the infliction of harm upon the creditor as the sole motivation, and (3) malice where the debtor's conduct giving rise to liability is also motivated by profit or gain or other benefit to the debtor. *In re Luppino,* 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998). The third type of malice requires an additional "aggravating factor" for the court to find an inference of actual malice. *Khafaga,* 419 B.R. at 550 (citing *In re Luppino,* 221 B.R. at 700). Whether circumstances are sufficiently aggravating to support a finding of malice is a fact-specific determination to be made on a case-by-case basis. *Wu v. Lin (In re Qiao Lin)*, 576 B.R. 32, 43 (Bankr. E.D.N.Y. 2017). The Defendant's conduct falls into the third category as he was seeking to profit or gain by diverting DFC's funds to Auto City.

The facts of this case are similar to *In re Wisell*, 494 B.R. 23 (Bankr. E.D.N.Y. 2011). The defendant in *Wisell* was the president of a company called IMUSA, and he transferred the inventory of IMUSA to an entity he owned and then did business under the new entity without

the knowledge or consent of IMUK. *Id.* at 30. The defendant also diverted money from IMUSA to another company for undocumented expenses and renovations to the facility. *Id.* This Court held, under § 523(a)(6), that the "the [d]ebtor's intentional deception and breach of contract resulted in a loss to the [p]laintiff" and was therefore "willful." *Id.* at 41. Further, the debtor's conduct exhibited implied malice because he used his position as president of IMUSA to misuse the funds of IMUSA for his own personal gain. The debtor knew or should have known that his conduct harmed IMUSA, and the same can be said for the Debtor with respect to his conduct vis-à-vis DFC.

The Defendant acted willfully, because the Defendant used DFC's assets for his other corporations, with no intention of repaying DFC in utter disregard of DFC's insolvency. This course of conduct was intended to deprive DFC of assets and harmed DFC. The Defendant's conduct was also malicious as he used his position as the sole owner of DFC to transfer funds to another entity wholly owned by him. For these reasons, the Court finds that the debt arising from the All City Transfers is nondischargeable under § 523(a)(6).

## **CONCLUSION**

For the reasons set forth in this Decision After Trial, the debt arising from the All City Transfers in the amount of $3,203,542 is non-dischargeable under 11 U.S.C. § 523(a)(4) and § 523(a)(6).  Judgment shall be entered in favor of the Plaintiff as to these two claims and the cause of action under 11 U.S.C. § 523(a)(2) is dismissed. In light of this Decision After Trial, the MSJ is dismissed as moot.



Dated: Central Islip, New York
September 5, 2024

Robert E. Grossman
United States Bankruptcy Judge